SOUTHERN RAILWAY CO. IN MISSISSIPPI *v.* MATHEW-McDONALD LUMBER CO.

[60 South. 42]

CARRIERS. *Refusal to furnish cars. Liability. Switch track.*

> Where a switch track was put in by a lumber company under a contract with a railroad company such as is disclosed by the contract in this case, the lumber company did not get title to the track, but the title remained in the railroad company and formed a part of its system, and must be operated impartially and without discrimination against parties demanding similar services, and on the failure of the railroad company so to do it must make reparation to a party injured by its failure to perform its duty.

APPEAL from the circuit court of Lowndes county. HON. T. B. CARROLL, Judge.

Suit by Mathew-McDonald Lumber Company against
the Southern Railway Company in Mississippi. From
a judgment for plaintiff, defendant appeals.

The defense was that the switch was constructed
for the sole use of the Interstate Lumber Company, and
a copy of the contract with said company is in evidence,
and is here set out:

"An agreement made and entered into this 9th day
of April, 1908, by and between the Southern Railway
Company in Mississippi, a corporation organized and
existing under and by virtue of the laws of the state of
Mississippi, hereinafter for convenience styled the Rail-
road Company, party of the first part, and Interstate
Lumber Company, a corporation organized and existing
under and by virtue of the laws of the state of Alabama,
hereinafter for convenience styled the Lumber Company,
party of the second part, witnesseth:

"That the Railroad Company, for and in considera-
tion of the sums of money hereinafter agreed to be paid
to it by the Lumber Company, and of the covenants of
the Lumber Company upon its part faithfully to be kept
and performed, as hereinafter expressed, hereby grant
unto the Lumber Company the right, license or privilege
to use conjointly with the Railroad Company, subject
to all the terms stipulated and conditions hereinafter
set out, all that certain portion of the main track of the
Railroad Company, extending from a point about one
and one-half miles east of Steens, in the county of Lowndes
and state of Mississippi, to Columbus, in the said county
and state, being a distance of eleven miles more or less,
for the purpose of operating the logging trains, engines
and cars of the Lumber Company over the same, and
hauling logs cut from the timber lands situate in the
territory traversed by the said portion of said main track
of the Railroad Company to the sawmill of the Lumber
Company at said Columbus, providing, however, and
it is distinctly understood that said grant and privilege

is made upon the following terms and conditions, all of which are to be complied with, kept and performed by the Lumber Company as conditions precedent to its right to use the said track and to the enjoyment of any privileges hereunder; that is to say:

"First.    That the Lumber Company will pay unto the Railroad Company in monthly settlements, promptly upon bills rendered therefor by the Railroad Company, the sum of one dollar ($1.00) per car for each and every loaded car transported to said Columbus over any portion of the said main track of the Railroad Company so as to be jointly used hereunder, as aforesaid; provided, however, that the minimum amount to be paid by the Lumber Company for any train containing a loaded car moved by it over the said portion of the said track of the Railway Company shall be ten dollars ($10.00), said rates to include the return of empty cars.

"Second.    That the Lumber Company shall furnish at its own cost and expense all such engines, cars and rolling stock necessary for the purpose of hauling logs, as aforesaid, as shall be acceptable to the Railway Company, and shall, at its own cost and expense, keep the same in good repair and proper condition, and shall in like manner furnish and provide all necessary competent engineers, conductors and trainmen for the management of trains of the Lumber Company operating on said line of railroad of the Railway Company, and shall pay all wages of such employees and other expenses incident to said trains and the operation thereof; and in the event that it shall be necessary, in the judgment of the Railway Company, at any time during the life of this agreement on account of such use of said main track by the Lumber Company for any additional telegraph offices and telegraph operators to be established and employed at any points on the said line, so as to be jointly used, at which the Railway Companay does not maintain such office or operator, then and in such

event the Railway Company may in order to provide for the safe and convenient hauling of trains, establish such telegraph office or offices, and employ, pay and maintain a competent telegraph operator at each and every such point; and the Lumber Company shall promptly, upon bills rendered therefor, pay unto the Railway Company, in cash, whatever sum or sums may be the entire actual cost to the Railroad Company of establishing such office or offices, and moreover shall, in like manner, pay unto the Railway Company in monthly settlements the salaries or wages paid by the Railway Company to such telegraph operator or operators.

"Third. That the qualifications of the engineers, conductors and trainmen, and each and all of them, to be employed by the Lumber Company, as aforesaid, shall be examined by the superintendent or other proper officer of the Railway Company and only such engineers, conductors and trainmen shall be employed by the Lumber Company as shall be approved by the Railway Company.

"Fourth. That the use of the said main track, and any and all parts thereof, by the Lumber Company shall always during the life of this agreement be subordinate to such use as the Railway Company may desire to make thereof; the Railway Company hereby expressly retains the right to the preference in respect to the use of said track for its own uses and purposes in all respects whatsoever.

"Fifth. That the Railway Company, through its duly authorized officers, shall at all times during the life of this agreement have the right to and shall decide under what conditions and rules trains of the Lumber Company shall operate on said main track of the Railway Company, and all rules made by the Railway Company in reference to the use of said main track, or the operation of engines or trains thereon, shall be binding upon the Lumber Company, its servants, agents and

employees, and shall be implicitly observed and obeyed by them.

"Sixth.   That the Lumber Company shall indemnify and save harmless the Railway Company against any and all loss, damage and expense of every nature, and against any and all claims, demands, suits, judgments and sums of money accruing to any party against the Railroad Company, growing out of or arising in connection with the use of said main track of the Railway Company by the Lumber Company, or the operation of the trains, engines and cars thereon.

"Seventh.   That the right to use said main track of the Railway Company, by the Lumber Company, and all rights conferred upon it by this agreement, shall at the option of the Railway Company be forfeited by the breach of any one or more of the conditions or other stipulations contained in this agreement to be kept, done and performed by the Lumber Company.

"Eighth.   That it will not handle upon the said logging trains any business or traffic other than the timber or the manufactured products thereof produced in the development of the lumber business of the Lumber Company, and will not suffer or permit any passengers or employees to be transported upon said trains other than the crew engaged in the operation of such trains.

"Ninth.   That the Lumber Company hereby expressly covenants and agrees that it will ship or cause to be shipped over the lines of the Railway Company and its connections all freights used or produced in or about the business of the Lumber Company, provided, however, that rates are afforded said Lumber Company by the Railroad Company which are not in excess of those of competing carriers of similar services performed under substantially similar circumstances and conditions; and it is covenanted and agreed:

"Tenth.   That the Lumber Company shall have the privilege during the life of this agreement, and at its

own expense, but under the supervision and subject to the direction of a section foreman or other proper officer of the Railway Company, of building spurs from the said portion of the said main track of the Railway Company, so to be jointly used hereunder, as aforesaid, for the purpose of collecting logs, the location of such spurs to be determined by the Railway Company, but as near the point selected by the Lumber Company as conditions will, in the judgment of the Railway Company, permit; provided, however, that the connection of such spurs of the Lumber Company with the said main track of the Railway Company shall be maintained by the Lumber Company at its own cost and expense and in all respects in accordance with the reasonable requirements of the Railway Company, looking to the safe and convenient operation of the Railway Company upon its said main track.

"Eleventh. That this agreement shall continue in effect for the full term of ten years next ensuing from and after the date of these presents; provided, however, that in the event that the Lumber Company shall violate any of its covenants in this agreement contained' or shall be in default in the payment of any rental or sum of money herein agreed to be by it paid in to the Railroad Company for thirty days after the same shall be due them, and in either of such events, the Railway Company may, by notice, in writing to the Lumber Company, declare this agreement to be determined, and may thereafter exclude the Lumber Company from the use of any portion of the said main track of the Railway Company covered hereby."

"Southern Railway Company.
"C. H. Acker, V. P. and General Manager.
"Washington, D. C., May 6, 1908.
"1—2701—7.

"Mr. A. E. Swanson, Secy, and Treas. Interstate Lumber Company, Columbus, Miss. Dear Sir: Refer-

ring to the matter of spurs for the Interstate Lumber Company near Steens, Miss., I will say that the papers have reached me on the subject and instructions have been issued to put the tracks in without further delay. On one of the tracks, 300 ft. in length, is estimated to cost $449.57, and the other, 400 ft. in length, is estimated to cost $551.80, or a total of $1,001.37, which amount is to be advanced by the Interstate Lumber Company, and the cost of the rail, fastenings and labor, estimated at $679.37, to be refunded to the Lumber Company out of the revenue of the Railroad Company on the basis of five cents per ton within a period of four and one-half years from date of completion of these tracks. Except for the matter of cost and refund, these tracks are covered by the trackage agreement dated April 9th, and if your company complies with the above terms it will not be necessary to make a supplemental agreement. Please advise me that this is satisfactory to the Interstate Lumber Company.

"Yours truly,<br>
"C. H. Ackert,<br>
"Vice Pres. and Genl. Manager."

*Catchings & Catchings*, for appellant.

*James T. Harrison*, for appellee.

Counsel on both sides filed elaborate briefs too long for publication.

Argued orally by *James T. Harrison*, for appellant.

COOK, J., delivered the opinion of the court.

Appellee instituted suit against appellant Railway Company for its failure and refusal to furnish cars to, and to receive freight from, appellee at Mullins Switch, located on the line of said Railway Company near Steens, Miss. The switch, or spur, is about three hundred and sixty feet long, and debouches from the main line of the railway. It seems that this spur was built on the

right of way of the Railway Company, and was construct-
ed at the instance and request of the Interstate Lumber
Company, and a contract was made between the Railway
Company and the  Interstate Lumber Company, which
read in connection with a letetr of the vice president
of the Railway Company, dated March 6th, 1908, and
addressed to A. E. Swanson, secretary and treasurer of
the Interstate Company, gave joint rights to the Railway
Company and the Interstate Company to use the ·spur.
In other words, the letter relates to the construction
of the spur, and the contract relates to the privilege
accorded to the Lumber Company to run its trains over
the main line of the Railway Company, and the letter
refers to the contract, for the purpose of making the
rules governing the operation of the Lumber Company's
trians on the main line applicable to their trains operated
on the spur.   About a year after this spur and switch
were built, appellee bought large tracts of timber ad-
joining and contiguous to Mullins Switch, and proceeded
to locate a sawmill near-by, for the purpose of converting
the timber into lumber for shipment at Mullins Switch.
The machinery for the plant was shipped over appellant's
lines and placed on this switch for unloading, and it
seems that some other person's freight was placed on ·
the switch for unloading.   When appellee desired cars
for the lumber, it applied to the common carrier, and
after a considerable delay it was advised by the carrier
that the spur on which this switch was located was a
·private spur, belonging to and under the control of the
Interstate Lumber Company, and that the Railway
Company could not furnish the cars without the consent
of the Interstate Company, and that the Interstate
Company refused to give its consent.   It is shown by the
evidence that the agent of the appellee, who induced
the railway to place the loaded cars of machinery on
Mullins Switch, had knowledge of the original contract
between the Railway Company and the Interstate Com-
pany.

103 Miss 6

It is manifest that the spur or switch was primarily for the benefit of the Interstate Company, and, had it been built entirely on the land of that company, quite a different question would be presented for solution; but it appears that the entire switch track was over the land and on the right of way of the Railway Company. It seems that the Interstate Company was not using the switch at the time of the alleged damage to plaintiff below, and had not put it to use for some time prior to the refusal of the Railway Company to furnish cars to palintiff.

Our construction of the agreement between the Railway Company and the Interstate Lumber Company leads us to the conclusion that the Interstate Company was granted no special privileges on or private control of the switch, but it did get the special privilege to operate its own trains over the main line of the railway; and reading the letter of the Railway Company in connection with the trackage agreement (and it is made a part of same) we can perceive nothing authorizing the assumption of the Interstate Company to dictate who should, or who should not, take advantage of the facilities provided by the switch track. Indeed, it is exceedingly doubtful whether the Railway Company had the power to make a contract with one shipper granting the extraordinary power claimed by the Interstate Company, and which the railway concedes in this litigation, whereby the control of a switch track on the railway's right of way is conferred upon a private corporation. Such was not the contract, and the interpretation put upon the real contract is strained, and the stress of circumstances must have suggested the construction.

The probable consequences of a contract sought to be established by construction is exemplified by just what occurred, and forms a basis for the present litigation. The Interstate Company and appellee are engaged in the same kind of business; and when the railway, acting

under the orders of its competitor, refused to deliver cars to appellee it delivered appellee into the hands of its business rival.

The natural result followed. Appellee was in the end forced to sell to its competitor the accumulated stock of logs and lumber, after futile attempts to find another purchaser. The facts of this case accentuate our doubtfulness of the validity of such a contract as appellant has constructed by ingenious argument, but which we think the Railway Company did not make. There is no claim that this switch had been abandoned as a shipping point; on the contrary, it is claimed the Interstate Company enjoys a ten years' exclusive grant to the railway's property at this point, limited alone by the reserved right to the Railway Comapny to use its own property as a parking ground for empties and cripples, or possibly for a passing track. This construction of the contract is made in the face of the careful retention of the railway's control over the movements and operation of the cars belonging to the Interstate Company over this track. The Interstate Company by this contract did not get title to the track, but the title remains in the company, and it is our opinion that it forms a part of its system, and must be operated impartially and without discrimination against parties demanding similar service; and having failed in this duty, to plaintiff's damage, it follows that it must make reparation. The learned trial court adopted this view of the case, and after a careful review of his rulings we can find no default with any of them.

Affirmed.